UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SUZETTE BELL | CIVIL ACTION |
| VERSUS | NO: 13-0341-KDE-SS |
| CAROLYN W. COLVIN, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION | |

## REPORT AND RECOMMENDATION

The plaintiff, Suzette A. Bell ("Bell"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On August 7, 2006, Bell filed a claim for disability insurance benefits. An Administrative Law Judge ("ALJ") issued an unfavorable decision on April 22, 2008. The request for review was denied by the Appeals Council on September 11, 2008. R. 64. No complaint was filed in federal court.

On October 26, 2010, Bell submitted a second application for disability insurance benefits alleging that she became unable to work on December 1, 2009. R. 152-53. She stated she was unable to work because of CREST syndrome and pulmonary arterial hypertension. R. 167. On September 6 and 13, 2011, there were hearings before an ALJ. R. 25-61. On October 28, 2011, the ALJ issued an unfavorable decision. R. 10-24. On December 21, 2012, the Appeals Council denied

a request for review.  R. 1-3.  On February 22, 2013, Bell filed a complaint in federal court.  Rec.

doc. 11.  The parties filed cross-motions for summary judgment.  Rec. docs. 14 and 15.

**STATEMENT OF ISSUE ON APPEAL**

**Issue.**  Whether relevant legal standards and substantial evidence support the ALJ's decision to decline to include manipulative limitations in assessing Bell's residual functional capacity and her ability to perform her past relevant work?

**THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUE ON APPEAL**

The ALJ made the following findings relevant to the issue on appeal:

1.    Bell last met the insured status requirements of the Act on December 31, 2009.

2.    Bell did not engage in substantial gainful activity during the period from her alleged onset date of December 1, 2009 through her date last insured of December 31, 2009 (20 C.F.R. § 404.1571 et seq.).

3.    Through the date last insured, Bell had the following severe impairments:  Scleroderma, CREST syndrome, AHA class II cardiac impairment, mild pulmonary fibrosis, and mild pulmonary hypertension (20 C.F.R. § 404.1520(c)).

4.    Through the date last insured, Bell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 1520(d), 404.1525 and 404.1526).

5.    Through the date last insured, Bell had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 1567(a) except that Bell can occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; be able to stand up every thirty minutes for a moment; and must avoid moderate exposure to fumes, dusts, odors, and gases.

6.    Through the date last insured, Bell was capable of performing past relevant work as an accounts receivable clerk and administrative assistant.  This work did not require the performance of work-related activities precluded by Bell's residual functional capacity (20 C.F.R. § 404.1565).

7.    Bell was not under a disability, as defined in the Act, from December 1, 2009, the alleged onset date, through December 31, 2009, the date last insurerd (20 C.F.R. § 404.1520(f)).

R. 15-18.

## ANALYSIS

a.      **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.  **Testimony at the Hearings.**

The first hearing was on September 6, 2011.  R. 25.

In Bell's application, the onset date was December 1, 2009.  R. 152-53.  She subsequently contended that it should be moved back to April 23, 2008, the day after the denial of the prior application for benefits.  R. 28.  The ALJ asked Bell's counsel for the medical evidence after the April 22, 2008 decision to demonstrate a change in her condition.  R. 30.  Bell's counsel responded that in 2010, she was diagnosed with scleroderma (chronic autoimmune disease) and she had previously been misdiagnosed.  R. 29-30.

Bell testified that she began seeing Dr. Marielisa Sedrish, a rheumatologist, in July 2010.

5

R. 31.  She saw Dr. Sedrish about every two months.  R. 33.  Dr. Sedrish prescribed Cymbalta and

Klonopin.  R. 33.  Dr. Francisco Candal is her primary care physician and a pulmonologist.  R. 31.

      Bell used a walker at the hearing since a surgery in July 2011 on her right great toe.  R. 31.

Within a week of the surgery, she slipped and needed a second surgery.  R. 32.  The toe was not

healing.  She had an appointment on September 22 with Dr. Luper, her podiatrist, for a bone

stimulator.  R. 32.  There were no medical records for the treatment of her toe at time of the

hearings, but they were ordered.  R. 34-35 and 51.

      The second hearing was on September 13, 2011.  R. 36.

      Dr. Steven Goldstein, a medical expert retained by the Social Security Administration,

participated by telephone.  R. 40.  He testified that:

> I believe this patient has been diagnosed as having scleroderma.  In fact, she's been diagnosed with having the CREST Syndrom, which stands for calcinosis, Raynaud's Syndrome, esophageal dysmotility, sclerodactyly and telangiectasia.  It's basically a systemic scleroderma.  We can see this has affected her lungs.  Of course, some fibrosis of the lungs we can see on x-ray.  We can see that it's caused her to have significant pain, but we can see that it has not really caused any significant fever.  We can see Dr. Candal diagnosed her on 10/25 of 2010, that she was – the degree of function was at the AHA class II, which was a mild cardiac disability secondary to the lung problem and the mild pulmonary hypertension that was present.  We can see on Exhibit 8F, page 18, she had pulmonary function test done on July the 14th of 2010, that essentially showed a normal pulmonary function in spite of her pulmonary fibrosis.  We can see at times and periods some of her pain was better, at least at some times, at 8F, 10 on 8/26/09, that she was feeling better.  She was taking care of an autistic child at home and that was the reason she wasn't working.  That's basically what I could see from the record that I was furnished.

R. 41-42.  The medical record indicated that medications were prescribed for pain following the foot

surgery (Demerol), pulmonary hypertension, high cholesterol, fibromyalgia, depression (Cymbalta),

joint pain (Diclofenac), and sleep aid (Clonazepam).   She also took vitamins, calcium for

osteoporosis and iron tables for her blood count and Tylenol.  R. 43-44.

Dr. Goldstein did not see any listing that her impairment met or equaled at any time since April 22, 2008.  R. 42.  From April 22, 2008 through the date of the hearing, Dr. Goldstein would limit her to sedentary activity because of the waxing and waning effect of the scleroderma.  R. 42 and 43.  Dr. Goldstein did not see a careful evaluation on physical examination of her scleroderma.  R. 42.  Because of her pain, she should have a sit-stand option.  R. 44.  At the sedentary level, she would have the ability to stand and walk for 2 hours out of an 8 hour day.  R. 45.

Dr. Goldstein testified that the record demonstrated that Bell was diagnosed with mild pulmonary hypertension and the functional class was AHA class II.  R. 46.  There are four different AHA classes.  R. 47.  Class I has no limitation.  R. 47.  Bell is in class II.  R. 47.  Within class II and with a particular experience, for example cardiac, she would experience fatigue and shortness of breath.  R. 47.  With activities limited to the sedentary level, Dr. Goldstein indicated that she would not experience such symptoms.  R. 47.

Bell testified that she had problems holding things with her right hand.  R. 48.  There was numbness in her both hands and numbness and tingling in her feet.  R. 48.  Her fingers cramped.  Dr. Sedrish told her to expect these symptoms with CREST Syndrome.  R. 48-49.  She cannot use a computer for more than about 20 minutes without her fingers cramping and becoming numb.  R. 49.  The condition with her hand is also caused by arthritis.  R. 49.  She cannot roll her hair because of the cramping problem.  R. 49.  She cannot use very small buttons.  R. 49.  She broke a lot of dishware because of the problem.  R. 49.

Bell had surgery on her right foot because of osteoarthritis and bone spurs.  After the procedures, she fell and the pins came out and she returned for further surgery.  R. 50.  She was set to return within 9 days of the hearing.  If the bones in her foot had not healed, the doctor planned

to put a bone stimulator on her foot.  If it did not secure the bone, she would have a third surgery. R. 50.  Bell could not get around without a walker which was prescribed for her.  She was not supposed to put any weight on her foot.  R. 50-51.

Bell's autistic child was 28.  He worked on Tuesdays and Thursdays.  The state provided him with a caretaker for 5 to 8 hours per day.  She described him as high functioning and said there was not much that she was required to do.  R. 56.  Her son stayed at the Hammond Development Center from 2007 to 2008, where his medications were adjusted.  R. 56.  The ALJ referred to a statement by one of her doctors, Dr. Candal, describing Bell as unable to work because she took care of her child.  R. 57.  Bell responded that this was not true.  R. 57.  The state provided assistance for her child for the three or four years before the hearing.  R. 57.

The vocational expert described Bell's past relevant work as an accounts receivable clerk and an administrative assistant as skilled sedentary work.  R. 51-52.  Based on the ALJ's hypothetical question, the vocational expert testified that Bell could perform her past relevant work.  R. 55.

Bell testified that her position as an overnight stock clerk at Wal-Mart was not sedentary. R. 55-56.  Bell described her duties as accounts receivable clerk at Waste Management Agency, including the responsibility for receiving parts and putting them on the proper shelves.  R. 58.  The vocational expert responded that based on the description, the position was on the light level depending on how heavy the parts were.  R. 58.  In response to the hypothetical question from counsel for Bell, the vocational expert testified that she would be unemployable.  R. 59-60.

c.    **Medical Evidence**.

<u>2006</u>

On March 23, 2006, Bell was seen James Griffee, M.D., at Ochsner in Slidell for complaints of chest pain on and off for the preceding six months.  The impression was chest pain, secondary to mitral valve prolapse.  R. 355.  On March 30, 2006, she was seen by William Jeffrey Long, M.D., a cardiologist, for a cardiology consultation.  R. 237.  A treadmill exercise test on April 7, 2006 resulted in a normal study, no evidence on ECG for ischemia and no evidence on myoview for ischemia.  R. 248-49.  On April 11, 2006, she was seen by John Glotfelty, a physician's assistant at Ochsner in Slidell, for complaints of chest pain, rash, dizziness and back pain. R. 351.  The impressions included chest pain of undetermined etiology, probable herniated disc and fullness in the left neck.  R. 353.  On April 12, 2006, she was seen by Dr. Long.  The impressions were elevated LDL (medication was prescribed and she was to return in 8 weeks), elevated blood pressure (borderline - medication prescribed) and atypical chest pain.  R. 234-35.

On April 28, 2006, Bell was seen by Mr. Glotfelty.  The impressions were:  (1) chest pain - noncardiac; (2) back pain - no evidence of herniated disk; (3) fullness left neck; and (4) left renal cyst.  She was sent to physical therapy 3 times a week for 4 weeks.  She needed a CT scan of her neck to diagnose the fullness in her neck.  R. 348.  On June 2, 2006, she returned to Mr. Glotfelty. The chief complaint was neck pain.  As to her chest paint, Mr. Glotfelty reported that her stress echo was negative, the echocardiogram was normal and her EKG was normal.  R. 346.  As to her back pain, a CT scan revealed mildly prominent submaxillary glands, an MRI revealed a benign small renal cyst and a physical exam demonstrated abnormal deep tendon reflexes in the legs.  Mr. Glotfelty states:

9

> A note from the physical therapy people shows she has clonus in the left heel cord. She dropped things with her right hand.  There is a focal weakness in the right quads and hams, global right grasp weakness, poor left shift.  Single leg stand with eyes closes:  Right is normal.  She has a dyskinesia of the right hand.  The patient is felt to have some sort of demyelinating process such as MS.

R. 346.  A June 6, 2006 CT scan of the head was negative.  R. 364.

On June 15, 2006, she was seen by Dr. Long.  The hypertension was under excellent control with medication.  Her LDL cholesterol was elevated.  Lipitor was prescribed.  R. 232-33.  A June 23, 2006 MRI of the head was negative.  R. 363.

On July 11, 2006, Bell was seen by James F. Griffee, M.D. at Ochsner in Slidell.  The impression was situational disturbance/depression.  Dr. Griffee reported that:  (1) the only thing that appeared in all the diagnostic tests was a simple cyst of her kidney; (2) she received physical therapy without much success; and (3) she had an appointment with a neurologist for the pain in her legs.  She reported trouble with her autistic son.  Medication was prescribed for her depression.  R. 342-43.  A July 19, 2006 MRI of the cervical spine revealed mild to moderate cervical stenosis related to disc protrusion at C3-C-4.  R. 295-96.  On September 14, 2006, she was seen by Dr. Griffee, who noted that her depression was improved with medication.  R. 340.

On October 24, 2006, Bell was seen by Felix Rabito, M.D., for a consultative examination in connection with her first application for benefits.  It appeared that her multiple organ complaints were best described by her depression and her positive response to Lexapro.  Her mental status appeared stable with no significant neurological deficits present.  Further examination by a neurologist would be required to rule out incipient neurological process.  R. 250-52.

On December 1, 2006, Bell reported trouble swallowing.  She was told to see an ENT doctor.  R. 256.

2007

On February 19, 2007, Bell was seen by Dr. Long.  She reported that she was feeling well. R. 274.  On April 5, 2007, she returned to Dr. Long and reported no complaints.  She was to return in six months.  R. 270.

A June 14, 2007 MRI of the cervical spine revealed rather mild cervical stenosis paracentrally to the right at C3/C4 with no cord or root compression.  The findings were less prominent than on

the prior study.  R. 293.  The remaining disc levels appeared unremarkable. R. 257.

On September 27, 2007, Dr. Long identified Bell's problems as:  (1) prior hypertension controlled on low-dose medication; (2) hyperlipidemia; and (3) degenerative joint disease.  The physical exam found her in no obvious distress.  An echocardiograph was normal.  R. 263.  The blood pressure medication was stopped with the pressure to be controlled by diet and exercise.  She was continued on medication for the hyperlipidemia.  R. 260-61.

2008

On January 30, 2008, Bell was seen by Francisco Candal, M.D., at Ochsner in Slidell for complaint of a headache for 5 days and numbness in her right arm.  The impression was headaches most likely secondary to muscle spasms.  Medication was prescribed.  R. 336-37.  A February 6, 2008 MR angiogram was normal.  R. 362.

2009

On July 29, 2009, Bell returned to Dr. Candal with complaints of leg pain for two months. The impression was peripheral neuropathy or restless legs.  Medication was prescribed.  She was to return in one month.  R. 308.  On August 26, 2009, she reported to Dr. Candal that she was feeling

better.  Her pains were almost all gone.  She complained of skin rashes in her elbow and chest which came and went.  R. 306.

<u>2010</u>

On June 2, 2010, after a blood test, Dr. Candal reported that her chemical profile was normal, there was slight anemia which was present in prior tests and was not worse, the lipid profile and thyroid were normal, and the cholesterol was good.  A rheumatologist was needed to evaluate collagen vascular disease.  R. 278.

On July 6, 2010, Bell was seen by Marielisa Sedrish, M.D., a rheumatologist.  She complained of joint pain in her hands and knees, muscle pain in her arms and legs, and a rash on her neck.  R. 327-29.  Clonazepam and Klonopin were prescribed.  R. 325.  A chest x-ray was normal.  R. 313.  A July 7, 2010 echocardiogram study found normal left ventricular and diastolic functions.  There was mild mitral regurgitation, moderate tricuspid regurgitation, mild pulmonic regurgitation, mild pulmonary hypertension, and trivial pericardial effusion.  R. 310-11.  A July 14, 2010 pulmonary function report revealed a normal study with normal lung volume and DLCO (diffusing capacity).  R. 316.  On July 21, 2010, Bell reported complaints of fatigue and dizziness to Dr. Sedrish.  R. 326.  She was diagnosed with CREST Syndrome.  R. 304.  She was to return in two months.  R. 326.

On August 2, 2010, Bell was seen by Dr. Candal.  She reported shortness of breath, back pains, achy feeling in her chest, burning feeling on her right side, numbness in her right arm accompanied by weakness, difficulty swallowing, and headaches on her left side.  R. 304.  She did not appear to be in any distress on physical exam.  The diagnoses were hypercholesterolemia,

scleroderma (CREST) with mild pulmonary hypertension - AHA class 2, and arm numbness and weakness of unknown etiology.  R. 304-05.  An August 6, 2010 brain MRI was normal.  R. 312.

On August 18, 2010, Bell reported to Dr. Sedrish shooting pains in her hands and feet.  R. 324.

On September 14, 2010, Bell saw Dr. Candal and reported a throbbing pain between her shoulder blades for about 3 months.  She sat in the bed working on the computer quite a bit.  The pain was worse at night.  She took care of her autistic child so she did not work outside of the home.  The diagnosis was unchanged from August 2, 2010.  R. 302-03.  Except for a small sliding hiatal hernia with possible mild reflux esophagitis, a September 20, 2010 esophagram was negative.  R. 288.

On October 25, 2010, Bell was seen by Dr. Candal.  She felt achy and with "electric shocks" attributed to the CREST syndrome.  On the physical exam she did not appear to be in any distress and she did not appear in acute pain.  The diagnosis was hypercholesterolemia and scleroderma (CREST) with mild pulmonary hypertension - AHA class 2  Rec. doc. 300-01.

Bell returned to Dr. Sedrish on October 27, 2010 reporting that she was doing "okay,"  with some swelling, there was no cough, and some aches and pains.  She was to return in three weeks. R. 323.  Bell was seen by Dr. Sedrish on November 30, 2010 reporting fatigue.  She was to return in two months.  R. 401.

<u>2011</u>

On January 4, 2010, Bell was seen by Dr. Candal reporting shortness of breath on mild exertion, sinus problems, and upper back pain.  She did not look to be in any distress or in acute pain. The diagnosis was hypercholesterolemia, scleroderma (CREST) and pleuritic pain. R. 383-84.

13

On January 14, 2010, Bell had an eye exam.  R. 381-82.  On January 31, 2011, Bell was seen by Dr. Sedrish.  She was to return in three months.  R. 400.

On February 4, 2011, there was a CT scan of the thorax.  The impression was bilateral fibrosis from her CREST.  R. 377 and 380.  On February 7, 2011, Bell saw Dr. Candal and reported bruising beginning three days before and pleuritic pain.  She did not appear to be in any distress or in acute pain.  The diagnosis was unchanged from January 4, 2010.  R. 377-79.

On March 17, 2011, Bell saw Dr. Candal and reported a dizzy spell while working in her kitchen.  At the time she also had a lot of shortness of breath.  The diagnosis was hypercholesterolemia and  scleroderma (CREST).  R. 427.  On March 25, 2011, a CT angiography of the chest was normal.  There was small left renal cyst.  R. 426.

On April 11, 2011, Dr. Sedrish completed a questionnaire.  R. 388-89.  On April 20, 2011, Dr. Candal completed a questionnaire.  R. 390.

On May 23, 2011, Bell saw Dr. Candal and reported infrequent dizzy spells, fatigue, muscle weakness, shortness of breath, headache, some depression, and back pain.  She did not appear to be in any distress or in acute pain.  The diagnosis was hypercholesterolemia, scleroderma (CREST), pleuritic pain, sleepiness and fatigue.  R. 424-25.

On June 6, 2011, Bell was seen by Keith Luper, M.D. at Ochsner in Slidell reporting severe pain in her left foot where there was a marked bunion deformity.  She sought surgical correction.  She was found in no acute distress.  R. 422-23.  A June 6, 2011 x-ray revealed small spurs in a metatarsal bone and heal bone.  R. 421.  On June 9, 2011, Bell returned to Dr. Luper.  While conservative treatment was recommended, she wanted a surgical cheilectomy and bunionectomy.  R. 418-20.

On June 21, 2011, Bell was seen by Dr. Candal. She reported feeling "pretty well." She was able to exercise on a small trampoline. The diagnosis was unchanged from May 23, 2011. She was cleared for the foot surgery. R. 416–17. On June 29, 2011, Bell was seen by Dr. Sedrish.

She complained of eyes burning and watering. There was swelling in her fingers. She was to return in three months. R. 391.

On July 7, 2011, she had the foot surgery. R. 415. On July 14, 2011, x-rays of her right foot were taken. R. 414. The foot was healing well without complication. R. 415. On July 18, 2011, x-rays were taken of her right foot and Dr. Luper reported that the hardware had broken loose and she was experiencing pain in the right foot. R. 411. He recommended further surgery. A walker was prescribed. R. 412-13. There were x-rays of the right foot on July 28, 2011. R. 408. The foot was healing well after the second surgery on July 21, 2011. Dr. Luper stressed the importance of total non-weight bearing for four to six weeks. R. 409-10.

On August 2, 2011, Bell was seen by Dr. Candal. She reported discomfort in the back of her leg. She did not appear to be in any distress or in acute pain. The diagnosis was unchanged from May 23, 2011. R. 406-07.

On August 11, 2011, Bell returned to Dr. Luper at which time the sutures were removed. She was to continue total non-weight bearing. R. 405. On August 25, 2011, Bell returned to Dr. Luper. X-rays showed increased osteotomy gap and possible back-out of the screws secondary to early weight-bearing against medical advice. R. 402 and 404. She was instructed to immediately cease and desist with weight bearing. R. 402-03.

d.    **Plaintiff's Appeal.**

**Issue.**    Whether relevant legal standards and substantial evidence support the ALJ's decision to decline to include manipulative limitations in assessing Bell's residual functional capacity and her ability to perform her past relevant work?

The ALJ found that Bell had the residual functional capacity ("RFC") to perform sedentary work and, through the date last insured, Bell was capable of performing past relevant work as an accounts receivable clerk and administrative assistant.  R. 16 and 18.  Bell contends that the ALJ failed to include limitations on the use of her hands and if he had done so, he would have found her disabled.

Bell argues that:  (1) as early as April 28, 2006, Bell's physical therapist noted that she dropped things with her right hand, there was global right grasp weakness, there was dyskinesia of the right hand and she was felt to have some sort of demyelinating process such as muscular sclerosis; (2) five years later, Dr. Candal indicated that on most days, on protracted use of her hands, such as operation of a computer keyboard, Bell experienced a progressive numbness and that would not have been different at any time during the course of his treatment of Bell; and (3) through the date last insured, December 31, 2009, Bell had Scleroderma, a severe impairment with hardening of the skin in the fingers.  Rec. doc. 14 (Memorandum at 5-6).

The Commissioner responds that:  (1) the physical therapist's note is not relevant because: (a) it pre-dates the relevant time; and (b) it pertains to a period covered by the prior decision; (2) the medical evidence relied on by Bell in her appeal does not support her contention that she could not perform fine manipulations; (3) the ALJ properly disregarded Dr. Candal's April 20, 2011 "check-box" questionnaire response; and (4) after reviewing the medical evidence, Dr. Goldstein declined to assess any limitations stemming from a hand impairment.

16

A.    Relevancy.

In her October 26, 2010 application for benefits, Bell stated that her onset date was December 1, 2009.  R. 163.  At the September 6, 2011 hearing, she sought to amend the onset date to April 23, 2008, the day after a decision denying her prior application for benefits.  R. 28.  Bell's counsel was unable to provide any medical evidence of disabling impairment prior to December 1, 2009.  R. 29-30.  The ALJ described the alleged onset date as December 1, 2009, R. 15, and Bell did not assign any error to the ALJ's refusal to accept the alleged onset date as April 23, 2008.  Rec. doc. 14 (Memorandum at 1).

Therefore, the alleged onset date is December 1, 2009.  The date last insured is December 31, 2009.  The issue is whether Bell was under a disability from December 1 through December 31, 2009.

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Bell argues that as early as April 28, 2006, her physical therapist noted a problem with her right hand.[2]  On June 2, 2006, the Ochsner (Slidell) physician's assistant, Mr. Glotfelty, reported that:

> A note from the physical therapy people shows she has clonus in the left heel cord. She dropped things with her right hand.  There is a focal weakness in the right quads and hams, global right grasp weakness, poor left shift.  Single leg stand with eyes

---

[2] Bell states, "[p]hysician assistant John Glotfelty noted that, as early as April 28, 2006, plaintiff had been sent to a physical therapist (PT), who had sent a note stating that she dropped things with her right hand, there was global right grasp weakness and poor left shift."  Rec. doc. 14 (Memorandum at 4).  That is a misstatement.  On April 28, 2006, Bell was seen by Mr. Glotfelty.  R. 348-49.  A plan was provided, including "physical therapy 3 times a week for 4 weeks."  Bell was sent to the physical therapist.  There is no record of a report from the physical therapist until June 2, 2006.  R. 346.

> closed:  Right is normal.  She has a dyskinesia of the right hand.  The patient is felt
> to have some sort of demyelinating process such as MS.

R. 346.

The Commissioner argues that this evidence is not relevant because it pre-dates the alleged

onset date by nearly three and a half years.  Information predating the alleged onset date may be

relevant in some circumstance.  For example, the length of the treatment relationship is one of the

factors considered in deciding the weight to be given to a medical opinion.  20 C.F.R. §

404.1527(d)(2)(i).

In addition to the three and a half year gap between the June 2, 2006 report and the alleged

onset date, there are no other reports of problems with Bell's hands during that time period.  On June

15, 2006, Bell was seen by Dr. Long, a cardiologist.  The note for the physical examination is

"[p]hysical exam shows a pleasant female in no obvious distress."  R. 232.  There is no mention of

a problem with her hands.  On July 11, 2006, Bell was seen by Dr. Giffee, who reports seeing her

"on multiple occasions for vague aches and pains in her back, her neck, and her legs."  R. 342.  He

notes that she received physical therapy.  There is no report of a problem with her hands.  R. 342.

On October 24, 2006, she was seen by Dr. Rabito for a consultative examination.  R. 250-52.  There

is no report of a problem with her hands.  The report of the physical examination states, in part:

> The extremities revealed no clubbing, edema or cyanosis; the pulses were full and
> equal bilaterally.  There was no deformity of the joints.  Flexion was full at both
> knees.  The applicant was able to straight leg raise to 90 degrees bilaterally without
> radicular pain.   Neuromuscular examination revealed normal muscle tone,
> development, range of motion and strength in the upper extremities.  There was no
> evidence of muscle atrophy or fasciculations.

R. 252.  In the four months following the June 2, 2006 report, Bell was seen by three different

physicians.  None report a problem with her hands.

18

In 2007, she was seen by Dr. Long on three occasions, but there is no report of a problem with her hands.  R. 260-61, 270 and 274.  Bell was seen by Dr. Candal on January 30, 2008 for complaints of headaches.  The report of the physical examination does not mention any problem with her hands.  For the extremities, the report states that, "[t]here is no clubbing, cyanosis or edema." R. 337.  On July 29, 2009, Bell complained of leg pain for the past two months.  The report of the physical examination is silent about any problem with Bell's hands.  R. 308.  On August 26, 2009, she reported she was feeling a lot better.  Again the physical examination is silent about any problem with Bell's hands.  R. 306.  There are no further reports of medical treatment prior to the alleged onset date of December 1, 2009.

The June 2, 2006 report from the physical therapist of a problem with Bell's hands is not relevant because it is too remote from the alleged onset date of December 1, 2009 and there is no other record of such a problem before the alleged onset date.

The Commissioner argues that the June 2, 2006 report was presented in Bell's prior claim and the April 22, 2008 decision on that claim is *res judicata*.[3]  The Commissioner urges that Bell is attempting to re-adjudicate the prior decision and this must be ejected.  As noted above there may be evidence, like the length of a treating relationship, which may have been presented in a prior claim and re-offered in a subsequent claim.  Bell is not attempting to re-open the finding that she was not disabled through April 22, 2008.  However, for the reasons stated above the June 2, 2006 report is not relevant to the period at issue in this case.

---

[3] *Res judicata* applies in administrative proceedings. U.S. v. Utah Const. & Min. Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560 (U.S.Ct.Cl. 1966).

B.    Medical Evidence.

The ALJ found that Bell had the residual functional capacity to perform sedentary work.  R. 16.  Sedentary work entails the fine use of fingers, whereas many light duty jobs require gross use of the hands to grasp, hold and turn objects.  Social Security Ruling 83-14, 1983 WL 31254 at *4. The June 2, 2006 note on the report from the physical therapist revealed that Bell dropped things with her right hand and she had global right grasp weakness.  R. 346.  The Commissioner correctly notes that June 2, 2006 note does not support her contention that she could not perform fine as opposed to gross manipulations.

C.    Dr. Candal's Questionnaire Response.

In April 2011, Drs. Sedrish and Candal completed questionnaires supplied by Bell's counsel. The ALJ referred to these responses and stated:

> [T]he treating physicians' opinions of record post-date the claimant's date last insured by almost two years, and are thus given no evidentiary weight as they do not address the medical evidence during the relevant period.

R. 18.  Bell argues that this is incorrect.  Rec. doc. 14 (Memorandum at 4).  She notes that Dr. Candal found that with protracted use of her hands, as is necessary to operate a computer keyboard, Bell experienced progressive numbness, pain and weakness.  This held true throughout her treatment by Dr. Candal going back to January 30, 2008.  Id. at 4 and R. 390.[4]

---

[4]  The same questions were put to Dr. Sedrish.  She did not indicate "yes" or "no" to those same questions.  R. 388.

The record reflects treatment by Dr. Candal from January 30, 2008 through August 2, 2011.[5] The only report of a problem with her hands was on June 21, 2011 (after the completion of the questionnaire on April 20, 2011 [R. 390]), when it is noted that, "[s]he also complains that her hands are cramping up lately." R. 416 (emphasis added).  The note for September 14, 2010 states, "[s]he sits in the bed working in the computer quite a bit." R. 302 (emphasis added).  The following statement repeatedly appears in Dr. Candal's reports:

> She is not employed at this time.  She is married and she has 1 autistic child for which she takes care.  This is the reason why she does not work outside the home.

R. 308, 306, 304, 302, 300, 383, 377, 427, 424, 416, and 406.  At the September 13, 2011 hearing, Bell was asked about these statements and she responded that they were not true.  R. 57.

The record reflects treatment by Dr. Sedrish from July 6, 2010 through June 29, 2011.[6]  The initial report reflects joint pain in the hands and knees.  R. 327.  On August 18, 2010, Bell reported shooting pain in both hands and feet.  R. 324.  On October 27, 2010, she reported some aches and pains.  R. 323.  On April 26, 2011, she reported that she was aching and stiff all over.  R. 396.  On June 29, 2011, she reported fingers swelling.  R. 391.[7]

In Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985), the ALJ rejected the treating physician's opinion that the claimant was totally disabled.  In reversing and remanding the Fifth

---

[5]  January 30, 2008 (R. 336-37); July 29, 2009 (R. 308); August 26, 2009 (R. 306); June 2, 2010 (R. 278); August 2, 2010 (R. 304); September 14, 2010 (R. 302-03); October 25, 2010 (R. 300); January 4, 2011 (R. 383-84); February 7, 2011 (R. 377); March 17, 2011 (R. 427); May 23, 2011 (R. 424-25); June 21, 2011 (R. 416); and August 2, 2011 (R. 406).

[6]  July 6, 2010 (R. 325-29); July 21, 2010 (R. 326); August 18, 2010 (R. 324); October 27, 2010 (R. 323); November 30, 2010 (R. 401); January 31, 2011 (R. 400); April 26, 2011 (R. 396); and June 29, 2011 (R. 391).

[7]  Dr. Sedrish's notes are handwritten and many are illegible.

21

Circuit said:

> This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability.  There are exceptions to this principle. The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.

770 F.2d at 485 (footnotes omitted).

There are factors that support the Commissioner's decision to decline to accord controlling weight to Dr. Candal's response to Bell's questionnaire.  First, the response was provided on April 20, 2011; 15 months after the date last insured.  Second, Dr. Candal's response concerning protracted use of her hands conflicts with the absence of such a finding by Dr. Sedrish in her questionnaire response.  Third, Dr. Candal's response conflicts with his treatment notes.  There is only one instance where Bell reports to Dr. Candal that her hand is cramping up; on June 21, 2011, more than 17 months after the date last insured.  R. 416.  Fourth, Dr. Candal described Bell as not working because she was taking care of her autistic child.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez, 64 F.3d at 174.

D.    Dr. Goldstein.

Dr. Goldstein was a neurologist who reviewed the medical evidence.  R. 150.  He testified that he did not see any listing which her impairment met or equaled at any time since April 22, 2008, the date of the prior decision.  R. 42.  Since April 22, 2008, Dr. Goldstein would limit her to a sedentary level of activities because of the effects of the scleroderma waxing and waning.  R. 42. Dr. Goldstein did not assess any limitations stemming from a hand impairment.

Bell's counsel chose not to ask Dr. Goldstein any questions about limitations with Bell's use of her hands.

*     *     *

The ALJ did not err in declining to recognize limitations on the use of Bell's hands from December 1, 2009, the alleged onset date, through December 31, 2009, the date last insured.  There is substantial evidence to support the finding that Bell could perform her past relevant work during the pertinent period, December 1-31, 2009.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 15) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 14) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 13th day of November, 2013.

**SALLY SHUSHAN**
**United States Magistrate Judge**